TT

**FILED**

OCT 2 9 2015

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

-------------------------------------------------------- X
             :

[SUPPRESSED]            :

            :

      Plaintiffs,    :

            :   Civil Action No. 15-cv-1459

v.             :   Judge Castillo

            :

[SUPPRESSED]            :   **SEALED DOCUMENT**

            :   **PURSUANT TO 31 U.S.C. 3730, L.R. 26.2**

      Defendant.   :

            :

-------------------------------------------------------- X

### FIRST AMENDED COMPLAINT

Law Offices of Norman Rifkind
100 East Huron, #1306
Chicago, Illinois 60611
Tel: (847) 372-4747

(Local Counsel)



Dated: October 29, 2015

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

```
------------------------------------------------------- X
                                           :
UNITED STATES OF AMERICA and the           :
State of ILLINOIS, ex rel., JANE DOE        :
                                           :
                        Plaintiffs,        :   Civil Action No. 15cv1454
                                           :
        V.                                 :
                                           :   Filed Under Seal
                                           :   Pursuant to
SEASONS HOSPICE, INC., D/B/A               :   31 U.S.C. § 3730
SEASONS HOSPICE & PALLIATIVE               :
CARE, INC., SEASONS HOSPICE AND            :
PALLIATIVE CARE OF ILLINOIS                :
                                           :
                        Defendant.         :
                                           :
------------------------------------------------------- :
                                           X
```

## FIRST AMENDED COMPLAINT

The United States of America and the State of Illinois (the "Government"), by and through its *qui tam* Relator, Jane Doe ("Relator"), bring this action under the Federal False Claims Act, 31 U.S.C. § 3729-3733, *et seq.* (the "False Claims Act" or "FCA") and the Illinois False Claims Act, 740 ILCS 175/1 *et seq.* against Seasons Hospice, Inc., D/B/A Seasons Hospice & Palliative Care, Inc., Seasons Hospice and Palliative Care of Illinois ("Seasons" or "Defendant") to recover all damages, penalties, and other remedies provided by the False Claims Act on behalf of the Government and the Relator, and for their complaint allege:

1.      This is an action to recover treble damages and civil penalties on behalf of the Government arising from false and fraudulent records, statements and claims made, used and caused to be made, used, and presented by Defendant and/or their agents, employees, predecessors, affiliates and co-conspirators, in violation of the federal False Claims Act.

1

2.     As set forth in more detail, herein, Defendant has submitted false claims to the Medicare Program for continuous care hospice services. The claims submitted to the Medicare Program by the Defendant were false because home health aides or other non-qualified personnel employed by the Defendant performed crisis care hospice services for more than 50% of each 24-hour shift, which, according to federal law, must only be performed predominantly by Registered Nurses ("RNs"), Licensed Practical Nurses ("LPNs") or Nurse's Practitioners ("NPs").

3.     Through its scheme, from at least 2009 through the present, Defendant has illegally billed the Government for, collected from, and profited to the tune of tens of millions of dollars.

## PARTIES

4.     Relator in this matter is Jane Doe. Relator was employed as a Team Director from 2012 through 2014 at the Burr Ridge, IL office of Seasons. Relator was responsible for supervising Seasons' hospice nurses, social workers, home health aides and other providers. As a Team Director, Relator supervised the interdisciplinary group meetings and provided overall direction of patient care including reviewing Seasons' policies and procedures to ensure compliance with state and federal regulations. Relator was also responsible for the quality of care, patient visit utilization, physician contact, care plan adherence and communication between medical specialties. Relator was also involved in the day-to-day business operations at Seasons, which included quality improvement initiatives and accounting for productivity, labor, and patient care costs. Relator has a Bachelor of Science in Nursing from the University of Illinois at Chicago and she is a Registered Professional Nurse with the State of Illinois.

5. Relator's allegations are based, in part, on the statements of Confidential Witness 1 ("CW 1"), who was employed by Seasons from June 2014 through September 2014 as a Business Operations Director.

6. Defendant Seasons is a Medicare and Medicaid certified hospice provider operating 21 facilities in 16 States, including California, Arizona, Texas, Missouri, Illinois, Indiana, Michigan, Wisconsin, Pennsylvania, Georgia, Florida, Maryland, Delaware, New Jersey, Massachusetts, and Connecticut. Seasons was founded in 1997 and has since grown to become the 4th largest hospice provider in the United States. Seasons is an active Illinois corporation. The national office for Seasons is located at 6400 Shafer Court, Suite 700, Rosemont, Illinois. Seasons operates in the various states in which it does business as domestic limited liability corporations. Upon information and belief, the allegations made herein are applicable to all of Seasons' facilities across the United States.

7. Relator is the original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act and other laws at issue herein.

8. Relator brings this action based the direct knowledge of Relator and CW 1 and, where indicated, on information and belief. None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. § 3730(e)(4).

9. Plaintiff United States of America, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare") and Grants to States for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§

1396 et seq. ("Medicaid") brings claims for violations of the False Claims Act and other laws alleged herein.

## JURISDICTION AND VENUE

10.     Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

11.     The Court may exercise personal jurisdiction over the Defendant, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. §§ 3729 *et seq.*, and complained of herein took place in part in this District and the Defendant transacted business in this District as described herein.

12.     Pursuant to 31 U.S.C. § 3730(b)(2), Relator prepared and served the Complaint on the Attorney General of the United States, and the United States Attorney for the Northern District of Illinois, as well as a statement of all material evidence and information currently in its possession and of which it is the original source.  These disclosure statements are supported by material evidence known to the Relator at the time of filing establishing the existence of Defendant's false claims.  Because the statements include attorney-client communications and work product of Relator's attorneys, and were submitted to those Federal officials in their capacity as potential co-counsel in the litigation, Relator understands these disclosures to be confidential and exempt from disclosure under the Freedom of Information Act.  5 U.S.C. § 552; 31 U.S.C. § 3729(c).

## LEGAL BACKGROUND

**A.**     **The False Claims Act**

13.     The False Claims Act provides, in pertinent part:

(a) Liability for certain acts. -

    (1) In general. —Subject to paragraph (2), any person who —
        (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

        (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

        (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

        (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

        (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

        (F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

        (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(b) Definitions. — For purposes of this section (1) the

    terms "knowing" and "knowingly" –

        (A) mean that a person, with respect to information

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

(2) the term "claim" —

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that –

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government –

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property,

31 U.S.C. § 3729(a), (b).

14.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 C.S.C. § 2461 (notes), and 28 C.F.R. § 85.1, False Claims Act civil penalties were increased from $5,000 to $11,000 for violations occurring on or after September 29, 1999.

**B.     Medicare Part A and Medicaid Hospice Benefit**

15.     The Medicare Program was established by Congress in 1965 pursuant to Title XVII of the Social Security Act.  The aim of the Medicare Program is to provide health insurance for the elderly and the disabled.  Specifically, Medicare beneficiaries are people 65 years of age and older, people under age 65 with certain disabilities, and people of all ages with end-stage renal disease. Medicare Part A provides basic hospital insurance.  Medicare Part B covers physician's services and other medical services not covered by Part A.  Both the Medicare hospice benefit and qualifying stays in skilled nursing facilities ("SNF") are covered under Medicare Part A.

16.     The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v is a government insurance program for persons of all ages whose income and resources are insufficient to pay for health care.  Medicaid is the largest source of funding for medical and health-related services for people with low income in the United States.  It is a means-tested program that is jointly funded by the state and federal governments and managed by the states.

17.     The Medicare hospice benefit was established by Congress in 1982.  The hospice benefit is intended to provide palliative care to individuals who have six months or less to live and who elect to forgo further curative treatment of a terminal illness.  Today, Medicare is the predominate source of payment for hospice services.  According to the National Hospice and Palliative Care Organization ("NHPCO"), in 2012, as compared to other payment sources, nearly

7

84% of hospice patients were covered by Medicare. In 2011, Medicare paid $13.7 billion for hospice care for 1.2 million beneficiaries. To be eligible for Medicare's hospice benefit, federal law requires that a beneficiary be covered by Medicare Part A and be certified as having a terminal illness with a life expectancy of six months or less if the disease runs its normal course. *See* Social Security Act, §§ 1814(a)(7)(A) and 1861(dd)(3)(A); 42 C.F.R. §§ 418.20 and 418.22.

18. Certification for hospice services occurs when a physician completes a Certification of Terminal Illness for the patient. Specifically, the first 90-day period of hospice care begins once the individual's attending physician (as defined in section 1861(dd)(3)(B) of the Social Security Act), and the medical director (or physician member of the interdisciplinary group described in section 1861(dd)(2)(B)) of the hospice program providing (or arranging for) the care, each certify in writing, at the beginning of the period, that the individual is terminally ill (as defined in section 1861(dd)(3)(A)), and based on the physician's or medical director's clinical judgment has six months or less to live if the individual's illness were to run its normal course. *See* Social Security Act § 1814 (a)(7).

19. There are four levels of care under the Medicare hospice benefit: (1) routine home care; (2) respite care; (3) general in-patient care; and (4) continuous or crisis care. *See* 42 C.F.R. § 418.302. Routine home care is the most common. Medicare reimburses the hospice at the routine home care ("RHC") rate for each day a beneficiary is under care and not in need of one of the other levels of care. The rate for routine home care in 2015 is $159.34 per day. Respite care is short-term in-patient care provided when necessary to relieve a beneficiary's normal caregiver(s). The rate for respite care in 2015 is $164.81 per day. General in-patient ("GIP") care is sometimes required for pain control and symptom management. GIP care is not equivalent to hospital level of care but it is provided in an in-patient facility, such as a SNF. It is the second most expensive level of hospice

8

care. The rate for GIP care in 2015 is $708.77 per day. Continuous care or crisis care is the highest level of hospice care. The rate for continuous care in 2015 is $929.91 per day or $38.75 per hour.

20.     Continuous care goes beyond palliative care and provides for nursing care, covered on a continuous basis for as much as 24 hours a day. *See* 42 C.F.R. § 418.204(a). A period of crisis is a period in which the individual requires continuous care to achieve palliation and management of acute medical symptoms. *Id.* It is provided to a patient during a "brief [period] of crisis," and only as necessary to allow the patient to remain at his or her residence. *See* 42 C.F.R. § 418.302(b)(2).

21.     During periods of crisis, federal law requires that the care rendered "must be predominantly nursing care." 42 C.F.R. § 418.204(a). Nursing care is care that is provided by a RN, LPN, or a NP. *See* Medicare Benefit Policy Manual, Chapter 9, Sec. 40.1.1. and 40.2.1. "Predominantly," within the context of 42 C.F.R. § 418.204(a)'s continuous care provision, means that greater than 50% of the hours of care provided within a 24-hour period are provided by an RN, LPN, or NP.

22.     If the number of hours of care provided by a home health aide or other person who is not an RN, LPN, or NP, exceeds the number of hours provided by such a licensed medical professional, then the hospice care should be claimed and paid for at the routine home care rate of $159.34 per day and not at the continuous care rate $929.91 per day. A continuous home care day is defined as: "a day on which an individual who has elected to receive hospice care is not in an inpatient facility and receives hospice care consisting predominantly of nursing care on a continuous basis at home. Home health aide (also known as a hospice aide) or homemaker services or both may also be provided on a continuous basis. Continuous home care is only furnished during brief periods of crisis as described in § 418.204(a) and only as necessary to maintain the terminally ill patient at home." 42 C.F.R. § 418.302.

23.     Importantly, if the crisis care lasts fewer than 8 hours on a given day then the provider should be paid the routine home care rate and not the continuous care rate. 42 C.F.R. § 418.302(e)(3). The amount that Medicare reimburses on a continuous care day varies depending on the number of hours of continuous services provided. The continuous home care rate is divided by 24 to yield an hourly rate ($38.75 per hour). The number of hours of continuous care provided during a continuous home care day is then multiplied by the hourly rate to yield the continuous home care payment for that day. A minimum of 8 hours of care must be furnished on a particular day to qualify for the continuous home care rate. 42 C.F.R. § 418.302(e)(4).

24.     Moreover, all Medicare and Medicaid certified hospice providers are required to comply with Medicare regulations and federal and state laws that govern the provision of hospice services. A failure to comply with these regulations and laws may cause a provider to be disqualified from participation in a federal or state healthcare program.

25.     Hospice providers obtain Medicare reimbursement by completing a CMS-1450 or UB-04 form. Among other information, this form must be completed to include the patient's identity, principal diagnosis, dates of the patient's certification and recertification of terminal illness, the location of the hospice services, and the level of services that were provided, *i.e.* routine care, continuous care, respite or GIP care. The claim form requires the provider to certify that the claim is "correct and complete," and the requisite supporting documentation is being done and maintained. After a provider submits a claim form to the MAC or fiscal intermediary, the claim is paid directly to the hospice provider.

26.     Federal law prohibits providers from retaining any overpayments. Overpayments are funds received or retained to which a provider is not lawfully entitled. *See* 42 U.S.C. § 1320a-7k(d)(4)(B). Overpayments must be returned either 60 days after the date on which the overpayment

was identified or the date any corresponding cost report is due, if applicable. *Id* at (d)(2). If not returned on a timely basis, overpayments are the basis of liability under the False Claims Act. *Id* at (d)(3).

## DEFENDANT'S SCHEME

### A. Seasons Fraudulently Bills Government Health Care Programs For Unnecessary Continuous Hospice Care

27.     Seasons has been certified under the Medicare hospice benefit to provide hospice services since 1997. On or about June 2013, the Relator was informed by the Director of Operations for Seasons, in Burr Ridge, IL, that Seasons was perpetrating a scheme which involved the fabrication of nursing hours, time records, payroll records and patient medical documentation to support fraudulent claims submitted by Seasons to Medicare and Medicaid for the continuous care level of hospice services.

28.     Season' claims for the number of continuous care nursing hours that were submitted to Medicare and Medicaid were false because more than 50% of the claimed services were provided by home health aides and other staff, not qualified to provide nursing care. Nevertheless, even though greater than 50% of the hours of care provided within a 24-hour period were not provided by an RN, LPN, or NP, these claims were still submitted for payment to the Government by Seasons at the higher, more costly continuous care rate of approximately $929 per 24 hour period, rather than the routine care rate of approximately $159 per day. As a result, it is estimated that Seasons fraudulently received millions of dollars in payments from Medicare and Medicaid from at least 2009, and perhaps longer.

29.     Certain Seasons supervisors and staff, at their direction, created schedules which assigned nurses and home health aides to continuous care patients. These schedules reflected the appropriate amount of skilled nursing care coverage for each continuous care patient. However,

these schedules were false because nursing care, as defined by Medicare and Medicaid, was never provided for the amount of time actually claimed by Seasons Hospice. In reality, these schedules falsely reflected visits by nurses and other skilled nursing staff to patients within a 24 hour period. Seasons did this to ensure that it could bill Medicare and Medicaid for hospice services at the higher continuous care rate, when in fact, it did not comply with Federal and State laws which mandate that the services of an RN, LPN or NP be provided for more than 50% of the time in a given 24-hour period.

30. Upon information and belief, Seasons did not want to bear the cost of hiring enough skilled nursing staff to cover more than 50% of the continuous care hours it billed, as required by law. Moreover, some of the skilled nursing staff did not show up on time for their shifts. Although Seasons was aware of this issue, instead of hiring more staff or ensuring that the existing staff reported to their shifts on a timely basis, Seasons engaged in a massive cover-up in order to both continue and disguise their fraudulent scheme.

31. To that end, home health aides that participated in Seasons' scheme were paid approximately $20 or more to provide "cover" for what was supposed to be nursing care hours. This was a small price to pay for Seasons so that it could continue to receive reimbursement at the continuous care rate of approximately $929 a day versus the routine home care rate of approximately $159 per day.

32. In connection with this scheme, Seasons directed certain members of their nursing staff, nursing supervisors and home health aides to falsify nursing notes for their patient visits. These false documents were included in the patients' medical records in order to support the false claims submitted to Medicare and Medicaid by Seasons.

33.     In addition, Seasons also directed certain members of its human resources, billing, and payroll staff to alter employee time and payroll records in order to coordinate with the false claims made to Medicare and Medicaid. This was done in a deliberate effort to disguise Seasons' fraudulent scheme.

34.     When a home health aide or nurse employed by Seasons reported to a patient's home for a continuous care shift, he or she was required to enter his or her arrival and departure times in Season's electronic time clock system — Paycomm. Paycomm was used to generate payroll records which, in turn, were used to calculate the compensation of Seasons' caretaker employees. However, in an effort to cover up Seasons' fraudulent continuous care billing scheme, employees in the payroll department were tasked with altering the arrival and departure times of caretaker employees to match the times entered on the phony nursing schedules. This was done by making various payroll "edits" in the Paycomm system. Edits do not permanently delete the prior time entries but, rather, make a change while leaving a history of the times originally entered.

35.     In or around June 2013, the Relator was informed by the Clinical Director of a number of discrepancies in the Paycomm system. The Clinical Director and Supervisor of Continuous Care commenced an investigation and subsequently discovered the above-described fraudulent billing scheme.

36.     After discovering the scheme, the Clinical Director immediately fired several of the home health aides and nursing staff which she identified as complicit in the scheme. She also reported the scheme internally to Seasons' Director of Quality and Seasons' Human Resource Manager. She also informed these individuals that she planned to notify Seasons' VP of Compliance, Senior Director of Operations, CEO and CFO. However, the Director of Quality instructed her not to discuss her findings with anyone else. Later, the Director of Quality

indicated that she had spoken with the VP of Compliance and that he wanted the investigation to end immediately. The Director of Quality stated that Seasons was not interested in "opening a can of worms." Upon information and belief, Seasons has not self-disclosed the fraud detailed herein to CMS, HHS, or any other entity in the Federal Government, the Illinois Government or the Government of any other state in which it does business. In addition, the company has not returned any of the overpayments made to it by Medicare and Medicaid as a result of the false claims submitted over the past several years.

## B. **Seasons Injured Patients in Order to Avoid Making Repayments to Medicare**

37.     Medicare limits or "caps" the amount any hospice may be paid in a given year. 42 U.S.C. § 1395f(i); 42 C.F.R. § 418.309. The aggregate cap amount is calculated by multiplying the adjusted cap amount ($26,725 in 2014) by the number of new Medicare beneficiaries admitted to the hospice during the year. Any monies paid by Medicare to a hospice provider in excess of the hospice's aggregate cap amount must be returned to Medicare. Because hospices are reimbursed at a flat rate per patient per day, the cap in effect penalizes hospices as their patients' average length of stay increases.

38.     According to CW 1, Seasons' management strove to maintain at 75% of the Company's aggregate cap amount. Problems arose at Seasons when its patients' average length of stay started to increase. Because its patients were remaining in hospice care longer, Seasons began to get closer to exceeding its yearly aggregate cap amount.

39.     According to CW 1, executives at Seasons sought to alleviate this problem by "getting some vents." According to CW 1, at her office, this scheme operated as follows: Seasons business development director Rebecca Rodriguez would send marketers to troll assigned hospitals looking for patients on ventilators. Once a ventilator patient was identified,

the marketer would contact Rodriguez who would then send a music therapist to the patient's room to play a harp for the family to soften them up. The marketer would then visit the family and convince them to admit the patient to hospice. Seasons would then admit the patient, keep them alive for about one day and then simply remove them from the ventilator and let the patient die. Doing so created cap space for Seasons due to the large margin between the actual reimbursement received (one day RHC = $159) and the statutory cap amount assumed for each patient ($26,725). It also decreased Seasons's overall average patient length of stay, thereby avoiding outlier status and consequent Medicare scrutiny.

40.     According to CW 1, "getting vents" was openly discussed at his office's weekly Leadership Meetings, which occurred on Mondays or Fridays, and were attended by CW 1, Seasons' office Executive Director Cathy Newman, the office's Clinical Director Rhonda Sickle and the office's Business Development Director Rebecca Rodriguez. In addition to Leadership Meetings, each director met by phone once a month with their regional supervisor. CW 1 states that the instructions to "get some vents" regularly were given to Rodriguez on her call with her supervisor, and knows this because Rodriguez would come to the Leadership Meetings and say "ok, here's what I got from my team ... we need to get some vents."

### C. Seasons Admitted Patients Whom Did Not Meet Medicare's Requirements for Hospice Care

41.     According to CW 1, many patients at Seasons did not qualify for hospice care under Medicare regulations, but were admitted for hospice care anyway. By listening during the Interdisciplinary Group Meetings (Wednesdays and Thursdays), CW 1 was able to determine that many of the patients discussed should not be on hospice, based on their symptoms and/or

diagnoses. According to CW 1, this practice of admitting unqualified patients was a regular occurrence at Seasons, particularly when the census declined.

42. CW 1 states there are other, objective facts that, when taken together, suggest that many of Seasons's hospice patients were not qualified to receive hospice care. First, the unusually long patient average lengths of stays (which led to "getting vents" as noted above). Second, Seasons's low infection rate (infections are common and expected in hospice) and corollary low antibiotic dispense rate. Third, none of the patients experienced bed sores (which are common as death approaches and skin breaks down).

### D. **Seasons Falsified Medical Records**

43. According to CW 1, shortly after joining Seasons, she began to review the paper records kept in the office. CW 1 observed "many, many, many" records that contained whited-out information, with new information (such as dates, signatures, orders, chart notes) entered over white out. In addition, according to CW 1, the whited out documents contained "clearly forged signatures." Upon noticing these forged documents, CW 1 called the regional HR manager, and informed her of the office's "major compliance issues" including "clear forgeries" and "stuff scribbled out." The HR manager told CW 1 to go speak with the primary perpetrators, Tina Shockey and Leslie Lane, both "team assistants," or support staff. When confronted, Shockey stated "I know we're not supposed to but we just have to get it done. We all do. Everyone does it."

44. CW 1 informed Shockey and Lane that they needed to stop the practice immediately, and that she would be escalating the issue within the company. Shockey responded that there was "no need to escalate" because we "just photocopy the documents with white out on them and throw away original, no one can tell." CW 1 spoke again with the HR manager and asked to fire

16

Shockey but was told no, not until the company's firing process was completed and the necessary approvals were obtained from regional Vice President Andrew Molosky and Season's national HR department. CW 1 gave the whited-out originals to Seasons employee Bren Houk.

### E. Seasons Fraudulently Provided Patients with GIP Care to Increase it's Payment from Medicare

45.    Seasons fraudulently provided and billed Medicare for GIP care in order to increase the payments it receives from government health care programs. As stated above, a hospice is reimbursed $708.77 per day for GIP care, the second most expensive level of hospice care. According to CW 1, Seasons would provided and bill Medicare for GIP care for patients who required a lower level of care in order to increase reimbursements.

46.    Approximately one month into her employment, CW 1 obtained access to and training on Seasons's electronic records system. She quickly realized that the entries for GIP patients did not support that level of billing. For example, Medicare rules require GIP level care be ordered by a doctor; Seasons's own rules require an RN and a doctor to see every GIP patient at least once a day. According to CW 1, the patient chart entries (or lack thereof) by RNs and physicians suggested the patients required RHC level care, if that, but certainly not GIP level care. Moreover, where a purported GIP patient was in an SNF, the SNF's billing record would reflect that the patient was on RHC. CW 1 confronted the clinical director, Sickle, with her findings. Sickle responded "yeah, I'll look into it." Soon thereafter, the charts were "magically" updated with entries to support the billing level. CW 1 states this happened "many, many, many, many, times," but does not know what percentage. And since it was done electronically, CW 1 could see that it was Sickle that updated all the records. Eventually, CW 1 stopped telling Sickle about the chart issues "so she would stop making things up."

### F. **Seasons Provided "Disastrous" Patient Care**

47.     CW 1 states that patient care at Seasons "was a disaster." She and her office dealt with "many, many, many" patients either complaining or revoking their election of hospice care. In September 2014 alone, when its patient census was at approximately 80, the office had 11 revocations.

48.     Most patient complaints resulted from nurses not showing up as scheduled or after being called on the emergency number. Sickle refuted the complaints by pointing to letters, surveys, phone calls and even bereavement letters (sent to the family after the patient's death) as "interactions," contending they took the place of face to face visits.

49.     In addition, the office's clinical director, Rhonda Sickle, was unfit for the position. For example, in August 2014, Sickle went out and got "fall down drunk" while on call. So that she could purport to fulfill her on-call obligations, Sickle forced team assistant Lane to be her designated driver. As Lane would report the next morning (in tears), Sickle had 9 gin and tonics, became "fall down drunk" and then refused to answer patient calls. One patient had to go to the emergency room for treatment because Sickle could not be reached. CW 1 informed Newman—who is friends with Sickle—about what happened and Newman opted to do nothing. CW 1 pressured her with two emails and a face-to-face meeting. As a result of CW 1's efforts, Newman gave Sickle a verbal reprimand, the lowest level of disciplinary action under Seasons policies.

50.     In addition, on two occasions, CW 1 found Sickle asleep on the floor of her office with the lights out. CW 1 reported this information to Newman, but nothing came of it so she reported it to Molosky. After Molosky confronted Sickle with the information, Sickle screamed at CW 1 during a meeting. Later, Sickle began following CW 1 in the office, around the parking garage, etc. and would always mention her "Smith & Wesson collection."

51.     Relator repeats each allegation in each of the proceeding paragraphs of this Complaint with the same force and effect as if set forth herein.

52.     As discussed in more detail, above,  Defendant has submitted and/or caused to be submitted false or fraudulent claims to government health care programs by: (i) billing government health care programs for unnecessary continuous care; (ii) injuring patients in order to avoid making repayments to Medicare; (iii) admitting patients whom did not meet Medicare's requirements for hospice care; (iv) falsifying medical records and other documents; (v) providing GIP care to patients to increase its payments from Medicare; and (vi) providing disastrous patient care.

53.     By virtue of the acts described herein, Defendant has violated:

(1)     31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

(2)     31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

(3)     31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

54.     To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relator realleges that Defendant knowingly violated 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(2); and 31 U.S.C. § 3729(a)(7) prior to amendment, by engaging in the above-described conduct.

55. By reason of the foregoing, the Government has suffered actual damages and is entitle to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT II
### (Illinois False Claims Act, 740 ILCS 175/1 *et seq.*)

56. Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

57. This is a *qui tam* action brought by Relator on behalf of the State of Illinois to recover treble damages and civil penalties under the Illinois False Claims Act, 740 ILCS 175/1 *et seq.*

58. 740 ILCS 175/3(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the State a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

59. Defendant violated 740 ILCS 175/3(a) and knowingly caused false claims to be made, used and presented to the State of Illinois by its deliberate and systematic violation of federal and state laws by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

60. The State of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by Defendant, healthcare providers and third party payers in connection therewith.

61.     Compliance with the applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Illinois in connection with Defendant's conduct. Compliance with applicable Illinois statutes was also a condition of payment of claims submitted to the State of Illinois.

62.     Had the State of Illinois known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

63.     As a result of Defendant's violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

64.     Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 740 ILCS 175/3(b) on behalf of herself and the State of Illinois.

65.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

## JURY TRIAL DEMANDED

66.     Relator demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays that the Court enter judgment against Defendant as follows:

(a)  As the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, provides:

i. that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint;

ii. that civil penalties of $11,000 be imposed for each and every false claim that Defendant caused to be presented to the United States and/or its grantees, and for each false record or statement that Defendant made, used, or caused to be made or used that was material to a false or fraudulent claim;

iii. that attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case be awarded;

iv. that Relator be awarded the maximum amount allowed to it pursuant to the False Claims Act; and

v. that this Court order such other and further relief as it deems proper.

(b) As the Illinois False Claims Act, 740 ILCS 175/1 *et seq.*, provides:

i. that the State of Illinois be awarded three times the amount of actual damages which the State of Illinois has sustained as a result of the false claims alleged within this Complaint;

ii. that a civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant presented or caused to be presented to the State of Illinois;

iii. prejudgment interest;

iv. that Relator be awarded the maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;

v.   that attorneys' fees, costs, and expenses that Relator necessarily incurred in

bringing and pressing this case be awarded; and

vi.  such further relief as this Court deems equitable and just.


DATED: October 27, 2015          Respectfully submitted,

**THE WEISER LAW FIRM, P.C.**
Christopher L. Nelson
James M. Ficaro
Ross M. Wolfe
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 225-2678

*Attorneys for Relator*

Norman Rifkind
Lasky & Rifkind, Ltd.
351 West Hubbard Street, Suite 401
Chicago, IL 60654
Telephone: (312) 634-0057
Facsimile: (312) 634-0059

*Liaison Counsel*